*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GARY ARLAND MITCHELL,

        Defendant-Appellant.

UNPUBLISHED
May 21, 2019

No. 339937
Washtenaw Circuit Court
LC No. 16-000789-FC

Before: SHAPIRO, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of assault with intent to murder, MCL 750.83; assault with a dangerous weapon, MCL 750.82; and domestic violence, MCL 750.81(2). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 30 to 60 years' imprisonment for the assault with intent to murder conviction; 7 to 15 years' imprisonment for assault with a dangerous weapon conviction; and 93 days in jail for the domestic violence conviction. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of an incident in which defendant hit the victim with his car in a Taco Bell parking lot in Milan, Michigan, on August 9, 2016. The victim and defendant were married; however, at the time of the incident, the victim had moved out of the couple's apartment with their minor son and the couple was in the midst of a custody dispute. Defendant maintained throughout the trial that he accidentally hit the victim.

Trial testimony revealed that the victim and defendant met on a music website called Jango in 2009. At the time the defendant and the victim met, the victim was 14 years old; however, she represented that she was 19 years old on the website. Defendant's profile on the website stated that he was 30 years old, but he was actually in his 50s. Defendant and the victim met in person in 2010, when she was 15 years old. The relationship eventually became romantic. At trial, the victim stated that she told defendant her actual age six or eight months after they met. He told her his actual age in 2012. The victim moved in with defendant in the summer of 2012, when she was 17 years old. The couple had a son in December 2014, and they married in

-1-

January 2015. In 2016, the victim decided to divorce defendant and she moved in with her parents. Eventually, the victim brought the minor child to her parents' home and obtained a personal protection order against defendant.

Shortly thereafter, defendant called Taco Bell, the victim's workplace, and asked to speak to the victim. When the victim answered the phone, defendant stated that he was "going to f----- kill [her]." In another incident, defendant went to the Taco Bell and demanded that the victim allow him to see the minor child. The victim called the police. The police asked defendant not to return to the Taco Bell. Defendant again returned to Taco Bell to speak with the victim. The victim called the police, but defendant left before the police arrived. A police officer found defendant walking on the sidewalk about five or six blocks away. Defendant was "very angry," and walked away when the officer attempted to talk with him. These events initiated an emergency custody hearing to be scheduled in August 2016.

On August 9, 2016, at about 11:00 a.m., the victim sat on the curb in the Taco Bell parking area smoking a cigarette on her work break. The victim heard "tires squeal." She saw defendant's 2007 Cadillac turning out of a nearby McDonald's drive-thru. The victim stood up and walked quickly toward the inside of the Taco Bell. The victim could hear the car approaching and knew that defendant wanted to speak with her. She tried to avoid making eye contact, however when she looked up defendant was about 10 feet away and was still traveling "pretty fast." She stood and looked at him because she did not think he would hit her with a car. The victim did not recall actually being hit by the car.

Elizabeth Wright was at the Valero gas station which shared a parking lot with the Taco Bell. Wright heard a woman yelling either "no, stop, no" or "stop no stop." Wright observed the victim standing in front of a car. The victim was backing away from the car while yelling at the driver. According to Wright, the car hit the victim and "kind of drag[ged] her over the curb and she end[ed] up with her hands on the vehicle and the, the [front] tire between her legs and stuck up against the light post." The car stopped when it hit the light pole.

The victim testified that she remembered opening her eyes and seeing the sky. Her right leg was next to the driver's side tire. The rest of her body was under the car. The victim could not properly breathe, and she was unable to move her left arm. Her arm was "pinned" between the light pole and the car's bumper. The victim was on the grass next to the parking lot. Defendant exited the car and said something about "making [her] pay." Defendant got down next to the victim on both knees and placed his hands around her neck, but he did not apply any pressure. Defendant then left without offering her assistance. The victim called the police. She was later treated for significant injuries.

Later that same day, police arrested defendant. Police obtained a warrant for the airbag control module from defendant's vehicle and retrieved speed measurements before the collision. Sergeant Kevin Lucidi testified as an expert in accident reconstruction. Lucidi explained that the data showed that at five seconds before the vehicle hit the light pole it was traveling at 16 miles per hour and the brake was not engaged. At four seconds, the car was traveling at 16 miles per hour and the brake was engaged. At three seconds, the car was traveling 11 miles per hour and the brake remained engaged. At two seconds, the vehicle was traveling at two miles per hour, the brake was not engaged, and the accelerator was engaged at 48%. At one second before the

car hit the light pole, it was traveling at seven miles per hour and the brake was engaged. Lucidi opined that defendant could have stopped the car before hitting the light pole if he had fully depressed the brakes. Defendant also called an expert, but the expert's testimony did not significantly differ from Lucidi's testimony.

Defendant testified that he saw the victim smoking a cigarette in the Taco Bell parking lot while he was driving on the night of the incident. Defendant admitted that he was driving between 30 and 40 miles per hour and that he was probably "squealing" the tires. The victim was sitting on the curb with her back against the light pole. She was still sitting in the same place when he turned into the Taco Bell parking lot. Defendant was driving 20 or 25 miles per hour in the parking lot. Defendant intended to pull into a parking space close to the victim to talk to her. Then, the victim suddenly "jumped up," and he either hit her or she ran into him. According to defendant, he accidentally hit the victim.

Defendant testified that he exited the car and ran to the victim. She was "passed out." Defendant checked for a pulse on her neck. The victim woke up and was "hysterical." Defendant panicked because she would not let him help her. He got back into his car to leave. Defendant did not see any blood, and he did not believe that the victim was injured. He drove around the building once, but the victim was gone. Defendant left the scene. He parked at a nearby pharmacy and watched. Defendant drove to Ann Arbor to see his divorce lawyer after the ambulance arrived.

Defendant presented the expert testimony of Dr. Denise John, an ophthalmologist. Dr. John explained that defendant was "glaucoma suspect" because his optic nerve was enlarged; however, defendant did not have glaucoma because his optic nerve was not damaged. She testified that a glaucoma-suspect person does not have any vision problems. Defendant was considered nearsighted, but he was not required to wear glasses to drive because he had 20/30 vision in his left eye. Defendant had adequate depth perception.

Defendant was convicted and sentenced as set forth above. This appeal ensued.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the prosecution failed to present sufficient evidence to sustain his conviction for assault with intent to murder.

A defendant's challenge to the sufficiency of the evidence is reviewed de novo. *People v Henderson*, 306 Mich App 1, 8; 854 NW2d 234 (2014). When analyzing a claim of insufficient evidence, we view the evidence in the light most favorable to the prosecution to determine "whether any rational trier of fact could have found that the essential elements of the crime charged were proven beyond a reasonable doubt." *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). "[C]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v McKinney*, 258 Mich App 157, 165; 670 NW2d 254 (2003) (quotation marks and citation omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the

evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

"The elements of the crime of assault with intent to murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Warren*, 200 Mich App 586, 588; 504 NW2d 907 (1993). Defendant contends that there was insufficient evidence to prove that he acted with intent to kill. "The intent to kill may be proven by inference from any facts in evidence." *Id*.

In this case, viewing the evidence in the light most favorable to the prosecution, *Lundy*, 467 Mich at 257, the record reveals that the prosecution presented sufficient evidence at trial to allow a rational jury to conclude beyond a reasonable doubt that defendant committed assault with intent to murder. The victim and defendant both testified that they were in the midst of a divorce and custody dispute. In addition, the victim testified that defendant called her place of employment and threatened to kill her. Similarly, an officer with the Milan Police Department testified that defendant stated that he would do anything necessary to get his son back and that "he was not afraid to go back to prison." In addition, an eyewitness testified that she heard the victim yelling. The victim was backing away from the car. The car then struck the victim, pushed her over a curb, and came to a stop after hitting the light pole in the grass. The victim was trapped between the car and the light pole. The victim testified that defendant exited the car after hitting her. She heard him say something "about making [her] pay." He then got down on the ground and placed both hands around her throat like he was trying to strangle her, but he did not apply any pressure. Defendant left the scene without offering any assistance or calling for help. Additionally, it appears that defendant did not stop his car after striking the victim. Instead, he drove over the curb and pinned her against the light pole in the grass. At two seconds before impact with the light pole, defendant pressed the accelerator at 48%. The prosecution's expert opined that defendant could have stopped the car before hitting the light pole if he had fully deployed the brakes.

Viewing this evidence in a light most favorable to the prosecution, a rational jury could have concluded beyond a reasonable doubt that defendant acted with intent to kill. Defendant threatened to kill the victim; he then struck the victim with a car, dragged her over a curb, and trapped her between the car and a light pole. Defendant left the scene without offering any assistance. This evidence would allow a rational jury to infer that defendant intended to kill the victim. See *id*. Accordingly, defendant is not entitled to relief on this issue.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that he was denied the effective assistance of trial counsel. Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). A trial court's findings of fact, if any, are reviewed for clear error, while constitutional issues are reviewed de novo. *Id*. at 579. In cases such as the instant case in which there was no evidentiary hearing held, this Court's review is limited to mistakes apparent on the record. *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994).

To establish ineffective assistance of counsel, a defendant must show that (1) counsel rendered assistance that "fell below the objective standard of reasonableness" under the prevailing professional norms, and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . ." *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000) (quotation marks and citation omitted; ellipsis in original). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (quotation marks and citation omitted). Furthermore, "[b]ecause the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *Id*.

In this case, after filing a claim of appeal, defendant moved the trial court for a new trial or a *Ginther*[1] hearing. Defendant argued that trial counsel was ineffective with respect to his consultation with the expert ophthalmologist. Defendant argued that trial counsel failed to consult with the expert sufficiently in advance of trial and failed to "present her testimony." Defendant also argued that trial counsel was ineffective when he failed to object to the prosecution's introduction of evidence that the victim was 14 years old at the time she commenced a relationship with defendant, who was much older. Defendant argued that the evidence was inadmissible under MRE 402, MRE 403, and MRE 404(b).[2] The trial court denied defendant's motion.

## 1. EVIDENCE OF VICTIM'S AGE

Defendant first argues that defense counsel was ineffective for failing to object when the prosecution introduced evidence that the victim was 14 years old when she began a relationship with defendant who was 52 years old. Specifically, the prosecutor referenced the relationship during his opening statement as follows:

> [T]his story . . . is actually going to start about eight years ago. That's when their relationship began.
>
> Their relationship began over the internet. [The victim] was a fourteen year old girl. She lived in Milan. She was on a music site called Jango . . . Enter fifty something Gary Mitchell. He had similar musical interests to this fourteen year old girl . . .
>
> They struck up a friendship. The defendant was living in New York at the time. Moved to Milan and shortly at some point during the course of the next couple years they began a relationship which ultimately when she turns seventeen

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] Defendant also argued that trial counsel was ineffective for failing to request certain text messages from the victim's cell phone. However, defendant abandoned this argument after appellate counsel had an opportunity to view the text messages.

resulted in them being married. They moved onto Tennessee and they were married. And they began their relationship.

Now on its face it seems pretty complicated, right. He's a much older man, she is a child. A young woman perhaps. But it really is not that complicated. [The victim] is going to take the stand. She's going to explain to you how this relationship worked. Not, not complicated at all. If she did everything [defendant] told her to do exactly the way he told her to do it, things went well for her.

And if she didn't do everything he told her to do exactly the way he told her to do it, things went poorly. I mean that's not that complicated. [The victim] figured out real quickly how this relationship was going to work.

\* \* \*

So she's going to testify about their relationship and I'm not going to go into all the details about that. I will let [the victim] tell her story about that relationship.

During the presentation of proofs, the victim testified that she was 22 years old. When the victim was 14 years old, she first met defendant through an online music sharing website called Jango. However, the victim admitted that she listed her age as 19 on the website. The victim testified that she met defendant in person in 2010 at a motel when she was 15 years old. That same year, the victim and defendant started a romantic relationship. The victim explained that she "came clean" about her age approximately six to eight months after she first started communicating with defendant in 2009. The victim testified that in 2012, she learned that defendant was 52 years old; that same year, when she was 17 years old, the victim moved in with defendant. In January 2015, the victim married defendant.

On appeal, defendant argues that evidence of the victim's age amounted to inadmissible other-acts evidence and that trial counsel was ineffective for failing to raise an objection. This argument lacks merit.

In general, "[a]ll relevant evidence is admissible" unless it is barred by the constitution, by the rules of evidence, or by the court rules. MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. However, evidence of prior bad acts "is not admissible to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1). Evidence of other bad acts may be admissible to show "motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1). In cases where a prosecutor intends to introduce other-acts evidence, the prosecutor "shall provide written notice at least 14 days in advance of trial . . ." MRE 404(b)(2).

In this case, the prosecutor did not offer evidence of the victim's young age to show that defendant committed a prior bad act and acted in conformity with his bad character. Rather, the

prosecutor offered the evidence to show how defendant used his age difference to manipulate and control the victim during the course of the relationship. This in turn was relevant to show that defendant was angry when he lost power and control over the victim when she left him, took the child with her, and proceeded with plans to divorce defendant. Evidence that defendant was angry with the victim made it more likely that he intended to kill the victim after he threatened to kill her and then ran her over with his vehicle. MRE 401. Specifically, during his opening statement and closing argument, the prosecutor outlined a narrative of defendant's relationship with the victim to provide a context for the assault. The prosecutor argued that the "dynamics of the relationship" were not complicated in that defendant forced the victim to do "everything [defendant] told her to do exactly the way he told her to do it." In contrast, when the victim did not do exactly as defendant instructed, "things went poorly for [the victim.]"

The prosecutor argued that defendant "exerted power and control" throughout the relationship until the victim "started to push back." The prosecutor encouraged the jury to consider the events that led up to the assault and argued that the backdrop to the assault was "a defendant who is losing control." The prosecutor continued,

> [A]gain the background of this moment is he's lost control of [the victim]. He's lost control of this little girl. She's grown up and she's a woman now. And she's had enough. And she has left him.

> * * *

> Defendant's angry, he's frustrated, he's mad and who is the source of all of his problems? . . . [The victim] is the source of all of his problems.

> Because he had her under his thumb for so long, I mean she was right there. She's wearing what he tells her to wear. She's not going out. She's not talking to other guys. He's got the money. Now where is she? Damn it, she's not there anymore. He does not have her anymore.

> The type of man who needs that type of control is the type of man who would run over his wife and kill her.

The prosecutor's arguments show that evidence of the victim's age was not offered as other-acts evidence to prove action in conformity therewith. The prosecutor instead used the evidence to illustrate the power dynamics of the relationship between defendant and the victim. The evidence showed that defendant was able to control and manipulate the much younger victim during the course of his relationship with her. When the victim had enough and decided to end the relationship, defendant became angry and retaliated. Evidence of the victim's youthfulness was therefore relevant to provide a context for the assault and to show that defendant intended to kill the victim when he assaulted her with his vehicle. The evidence was not improper other-acts evidence under MRE 404(b); rather, the evidence was relevant and admissible under MRE 401 and MRE 402. Accordingly, trial counsel was not deficient in failing to object on these grounds. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

Moreover, to the extent that defendant argues that the evidence was unfairly prejudicial, the probative value of the evidence was not outweighed by the danger of unfair prejudice for purposes of MRE 403. MRE 403 provides that admissible evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . " "The 'unfair prejudice' language of MRE 403 refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (some quotation marks and citations omitted). "Moreover, admission of [e]vidence is unfairly prejudicial when . . . [the danger exists] that marginally probative evidence will be given undue or preemptive weight by the jury." *Id*. (quotation marks and citation omitted) (alteration in original).

In this case, evidence of the victim's youthfulness did not introduce considerations extraneous to the merits of the lawsuit. The evidence was not offered to inject bias or incite shock or anger by depicting defendant as a predator. Instead, as discussed above, the prosecutor offered the evidence for a relevant purpose. The evidence was relevant to show the power dynamics in defendant's relationship with the victim. The evidence established that defendant controlled the victim during the relationship and that he became angry when he lost that power and the victim decided to leave him. This in turn was probative of defendant's intent at the time of the assault, which was a critical element in this case. In short, the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice" and trial counsel was not deficient for failing to object under MRE 403. See *Ericksen*, 288 Mich App at 201.

## 2. EXPERT WITNESS

Next, defendant argues that trial counsel was ineffective for not obtaining an eye examination for defendant and for presenting Dr. John's testimony when it did not support defendant's theory that his poor eyesight caused the accident. This argument lacks merit.

Approximately three weeks before trial, trial counsel obtained an order from the trial court for defendant to be transported to an eye examination. It appears that defendant initially refused to share the results of that examination with trial counsel; at a status conference the trial court informed defendant that he had to share the results if he wanted the doctor to testify at his trial. Defendant indicated that he wanted to present evidence that he had mild degenerative glaucoma. He maintained that his eyesight was "a personal part" of his defense and that the glaucoma diagnosis supported that he accidentally hit the victim.

On the third day of trial, trial counsel requested and was granted five minutes to meet with Dr. John before her testimony. Dr. John explained that she reviewed a report of an eye examination that was performed on defendant on May 26, 2017, by a resident at the Veteran's Administration hospital where Dr. John worked. Trial counsel asked Dr. John about the symptoms that a person who is glaucoma-suspect would experience and he elicited testimony from Dr. John showing that defendant would have trouble seeing at a distance without glasses. Dr. John also explained that defendant would have worse depth perception than someone who had 20/20 vision in both eyes, but she explained that defendant still had adequate depth perception for driving.

Trial counsel was not deficient in presenting Dr. John as a witness at trial. At a pretrial status conference defendant stated that he wanted to present a vision defense. Trial counsel ensured that defendant received an eye examination by obtaining an order permitting defendant's release and transportation to the examination. In accordance with defendant's desire to present a vision defense, trial counsel called Dr. John as an expert witness to testify about the results of the examination. Trial counsel proceeded to ask relevant questions and displayed a knowledge of the results of the examination during his examination of Dr. John. In short, defendant insisted on presenting evidence of his vision and trial counsel attempted to comply with defendant's request. Defendant cannot now claim that trial counsel was deficient in presenting the defense.

Moreover, even if defense counsel was deficient with respect to Dr. John, defendant cannot show that any deficient performance in this respect resulted in prejudice. Here, the results of the examination were not favorable to defendant, yet defendant wanted to pursue the defense. In addition, defendant himself contradicted his vision defense. In his own testimony, defendant claimed that he saw the victim sitting down smoking a cigarette in the Taco Bell parking lot as he was speeding down the road. Defendant also testified that he saw the victim in the parking lot as he was approaching her. He claimed that the victim "jumped up" and that he either hit her or she ran into him. Defendant fails to articulate what trial counsel could have done differently to establish that defendant accidentally hit the victim as a result of his poor vision. Furthermore, there was substantial evidence to show that defendant intentionally hit the victim with his vehicle. Accordingly, defendant has failed to show a reasonable probability that but for trial counsel's performance with respect to Dr. John, the result of the proceeding would have been different. See *Toma*, 462 Mich at 302-303.

### 3. HANDLING OF WITNESSES

In a Standard 4 brief, defendant argues that trial counsel was ineffective with respect to his handling of several witnesses.

Defendant argues that defense counsel was ineffective for failing to object to the testimony of a police officer. The officer testified that defendant stated that he would do anything necessary to get his son back and that "he was not afraid to go back to prison." However, defense counsel did object to this proposed testimony before trial. At a hearing regarding the motion, defense counsel argued that the statement was prejudicial because it informed the jury that defendant had been in prison before. The trial court rejected this argument and allowed the testimony regarding the incident. Moreover, defendant testified that he went to the police station to ask for help, but the police were not cooperative. He testified that he said that he would do whatever he needed to do and that he had been in prison before and did not want to go back. Accordingly, defense counsel was not ineffective in this regard because he did object to the officer's testimony and defendant testified that he went to the police for help.

Next, defendant contends that trial counsel was ineffective for failing to "move to impeach the victim's testimony." To the extent defendant argues trial counsel was deficient in his cross-examination of the victim, "[d]ecisions regarding whether to call or question witnesses are presumed to be matters of trial strategy." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). "[T]his Court will not second-guess defense counsel's judgment on matters of trial strategy." *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011).

Trial counsel was not deficient in his cross-examination of the victim. Trial counsel questioned the victim regarding statements she made in her divorce petition in which she stated that defendant beat her after he hit her with the vehicle. The victim admitted that this assertion was a lie. Trial counsel also questioned the victim about why she moved back in with defendant after she initially left him, whether she lied to defendant to get her child back, and asked about her recollection of the events that occurred on the day of the incident. Trial counsel questioned the victim about defendant's previous bad driving habits and asked her whether she was aware that defendant had issues with his vision. Trial counsel questioned the victim about why she failed to report defendant's threat to "make her pay" to the medical personnel and whether she denied defendant the opportunity to see his son for over a month. Trial counsel also impeached the victim with inconsistent testimony she provided at the preliminary examination when she stated that she did not recall what defendant said to her after he hit her with a vehicle. In short, trial counsel conducted a thorough cross-examination of the victim and his strategic decisions regarding which questions to ask did not fall below an objective standard of reasonableness. See *Russell*, 297 Mich App at 716.

Next, defendant argues that defense counsel was ineffective for failing to object to Lucidi's testimony. Defendant contends that Lucidi was "allowed to give at least a half hour worth of baffling, useless testimony." Defendant does not identify specific aspects of Lucidi's testimony that was irrelevant and inadmissible under MRE 401. See *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001) ("Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position.") (quotation marks and citation omitted). Nevertheless, we have reviewed Lucidi's testimony and conclude that it met the threshold for relevancy under MRE 401 in that it had some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Specifically, Lucidi testified about his investigation of the crime scene and the data contained on the airbag control module. This testimony was relevant in that it provided the jury an overview of what happened in the moments leading up to the time that defendant hit the victim. Evidence regarding the vehicle's speed and failure to fully deploy the brakes was probative of defendant's intent, which was at issue in this case. In short, Lucidi's testimony was relevant and trial counsel was not deficient for failing to raise a meritless objection under MRE 401. See *Ericksen*, 288 Mich App at 201.

Moreover, to the extent that defendant argues that Lucidi's testimony was irrelevant because it was based on tire tracks that were not compared to defendant's vehicle, this argument also lacks merit. Lucidi testified that he was not sure whether the tire marks leading up to the light pole were connected to the incident. He stated that he did not include the tire marks in his report calculations, but he took note of them because they were present at the scene. Lucidi further explained that if he considered the tire marks as being involved in the incident, the only reasonable conclusion was that the marks were made when a vehicle accelerated away from the light pole. On cross-examination, Lucidi admitted that he did not measure the tire tracks and compare them to defendant's vehicle. In short, defendant has not shown that counsel was ineffective in failing to object to Lucidi's testimony under MRE 401, see *id.*, or that trial counsel was deficient in cross-examining Lucidi, see *Russell*, 297 Mich App at 716.

4. FAILURE TO OBJECT TO PRV SCORE

Finally, in his Standard 4 brief, defendant contends that trial counsel was ineffective because he failed to object to defendant's sentence. Specifically, defendant appears to contend that the trial court erred in scoring prior record variable (PRV) 1 in that the trial court considered a prior felony conviction that occurred more than 10 years ago.

Pursuant to MCL 777.51, PRV 1 is scored for prior "high severity felony convictions." A trial court must assess 75 points if the offender has "3 or more prior high severity felony convictions." The prosecution does not contest that the trial court assessed 75 points for PRV 1. MCL 777.50 provides in relevant part as follows:

> (1) In scoring prior record variables 1 to 5, do not use any conviction or juvenile adjudication that precedes a period of 10 or more years between the discharge date from a conviction or juvenile adjudication and the defendant's commission of the next offense resulting in a conviction or juvenile adjudication.

Defendant does not contest that he has three prior high-severity felony convictions for purpose of PRV 1; rather, defendant argues that the trial court considered a conviction that occurred more than 10 years before the offenses in this case. Defendant contends that trial counsel was ineffective for failing to object on this basis.

MCL 777.50 directs a trial court to score PRVs 1 through 5 as follows:

> (2) Apply subsection (1) by determining the time between the discharge date for the prior conviction or juvenile adjudication most recently preceding the commission date of the sentencing offense. If it is 10 or more years, do not use that prior conviction or juvenile adjudication and any earlier conviction or juvenile adjudication in scoring prior record variables. If it is less than 10 years, use that prior conviction or juvenile adjudication in scoring prior record variables and determine the time between the commission date of that prior conviction and the discharge date of the next earlier prior conviction or juvenile adjudication. If that period is 10 or more years, do not use that prior conviction or juvenile adjudication and any earlier conviction or juvenile adjudication in scoring prior record variables. If it is less than 10 years, use that prior conviction or juvenile adjudication in scoring prior record variables and repeat this determination for each remaining prior conviction or juvenile adjudication until a period of 10 or more years is found or no prior convictions or juvenile adjudications remain.

> (3) If a discharge date is not available, add either the time defendant was sentenced to probation or the length of the minimum incarceration term to the date of the conviction and use that date as the discharge date.

The "10-year gap" rule enumerated in MCL 777.50(1) applies to all types of prior convictions and adjudications including high-severity felonies, low-severity felonies, high-severity juvenile adjudications, low-severity juvenile adjudications, and misdemeanors. See *People v Butler*, 315 Mich App 546, 551-552; 892 NW2d 6 (2016). This, however, does not mean that the 10-year gap rule must be separately applied to each class. Rather, any type of conviction or juvenile adjudication will trigger the start of a new 10-year period. "When an

offender has gone 10 years between the discharge from a conviction and the commission of his or her next offense, all convictions, regardless of the crime, are to be ignored." *Id.* at 552 (emphasis added). "In making this judgment, the Legislature, not unreasonably, insisted that the 10-year conviction-free period be exactly that: conviction free." *Id.* As such, any conviction or adjudication, even one that would otherwise not be scored under a particular PRV, will interrupt the running of the 10-year period. *Id.* at 552-553.

Defendant's presentence investigation report (PSIR) indicates that he had 6 prior felony convictions and 4 prior misdemeanor convictions. A close review of the timeline of defendant's convictions indicates there was not a 10-year gap that would preclude the trial court from assessing 75 points for PRV 1. Defendant was discharged from a prior Michigan misdemeanor conviction on February 22, 2013. Less than 10 years before that discharge, on February 25, 2004, defendant was discharged from two prior Arizona felony convictions for sexual assault and sexual assault on a corrections officer. Less than one year before the Arizona discharges, on April 30, 2003, defendant completed his sentence for a prior felony conviction for drug offense in Utah.[3] Therefore, defendant had three prior felony convictions in a timeframe that did not include a 10-year gap under MCL 777.50. Defendant does not dispute that these three prior felony convictions were "high severity" felonies for purposes of PRV 1.[4] Trial counsel was not ineffective for failing to object to the scoring of PRV 1. See *Ericksen*, 288 Mich App at 201.

In sum, defendant was not denied the effective assistance of counsel and the trial court did not abuse its discretion in denying defendant's motion for a new trial or a *Ginther* hearing.

C. COUNSEL OF CHOICE

In his Standard 4 brief, defendant argues that the trial court erred in denying his request to adjourn trial so that he could obtain a new trial counsel. We disagree.

We review "for an abuse of discretion a trial court's exercise of discretion affecting a defendant's right to counsel of choice." *People v Akins*, 259 Mich App 545, 556; 675 NW2d 863 (2003) (quotation marks and citation omitted). An abuse of discretion occurs "when the court

---

[3] The discharge date for the Utah offense is not listed in the PSIR; however, defendant was convicted on April 30, 1998 for that offense and he was sentenced to 5 years' imprisonment. Therefore, April 30, 2003 is considered in lieu of a discharge date. See MCL 777.50(3).

[4] A "prior high severity felony" conviction is defined to be a conviction entered before the commission of the sentencing offense whose offense class is listed as M2, A, B, C, or D, a felony under federal law or another state's law that corresponds to a crime whose offense class is listed as M2, A, B, C, or D, or a felony that is punishable by a maximum term of 10 years or more and that is not listed as offense class M2, A, B, C, D, E, F, G, or H, or a corresponding felony under federal law or another state's law. See MCL 777.51(2). As used under MCL 777.51, the term "correspond," means similar or analogous; it does not mean in agreement with or matching. See *People v Crews*, 299 Mich App 381, 390-392; 829 NW2d 898 (2013).

chooses an outcome that falls outside the range of principled outcomes." *People v Douglas*, 496 Mich 557, 565; 852 NW2d 587 (2014) (quotation marks and citation omitted).

"The Sixth Amendment guarantees an accused the right to retain counsel of choice." *Akins*, 259 Mich App at 557 (quotation marks and citation omitted). However, that right "is not absolute." *Id*. (quotation marks and citation omitted). "A balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice is done in order to determine whether an accused's right to choose counsel has been violated." *Id*. (quotation marks and citation omitted.)

> When reviewing a trial court's decision to deny a defense attorney's motion to withdraw and a defendant's motion for a continuance to obtain another attorney, we consider the following factors: (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision. [*People v Echavarria*, 233 Mich App 356, 369; 592 NW2d 737 (1999).]

In this case, at a pretrial hearing on March 14, 2017, defendant was represented by appointed counsel, but he moved to terminate appointed counsel and requested additional time to hire an attorney on his own. The trial court denied the motion to terminate appointed counsel, but adjourned the trial date to April 17, 2017. The trial court explained that defendant could hire new counsel, but new counsel would have to be ready to go to trial on April 17, 2017.

At an April 4, 2017 pretrial hearing, appointed counsel Robert Killewald requested another adjournment, explaining, "as you know, we were his original attorney. [Defendant] hired Mr. Burkett. Months later, Mr. Burkett was fired and it's back to us now." The trial court denied the motion to adjourn, noting that defendant had already fired previous counsel, hired "Mr. Burkett" and then fired him.

At an April 11, 2017 pretrial hearing, defendant again stated that he wished to obtain different counsel. The trial court again adjourned trial and explained that defendant could hire his own counsel, but new counsel would have to file an appearance by May 2, 2017, and be ready for trial on June 5, 2017. Subsequently, at a pretrial hearing on May 2, 2017, appointed counsel Killewald informed the trial court that he provided defendant the names of three other attorneys, but explained that none of the attorneys were going to represent defendant.

Finally, on May 30, 2017, defendant again indicated that he wanted to hire a different attorney. The trial court indicated that defendant already hired and fired a different counsel and that the trial court provided defendant an opportunity to hire another counsel in March 2017, which defendant failed to do and again in April 2017. The trial court refused to again adjourn trial and stated that appointed counsel Killewald would represent defendant at trial.

The trial court did not abuse its discretion in denying defendant's request for an additional adjournment to hire new counsel. The trial court provided defendant opportunities to

hire different counsel as he requested. However, defendant failed to obtain substitute counsel by the trial court's imposed deadlines. Defendant was afforded ample opportunity to hire counsel of his choice and he did not do so. The trial court appointed counsel for defendant and appointed counsel proceeded to represent defendant at trial. Trial counsel did not render ineffective assistance of counsel and defendant has not demonstrated prejudice. In sum, considering that the trial court previously adjourned the trial twice and provided defendant an opportunity to substitute counsel, the trial court did not abuse its discretion when it denied a request for a third adjournment at the May 30, 2017 settlement conference. In short, defendant was not denied his right to retain counsel of his choice. See *id*.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Jane M. Beckering